The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oye, oye, oye, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this honorable court. Good morning everybody. Please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. We have four cases on for hearing this morning. First up is 24-1432 Tarquinio v. Johns Hopkins University Applied Physics Lab. Mr. Collins. Good morning, your honors. May it please the court. The Americans with Disabilities Act, 42 U.S.C., section 1212112B3 and B6 stand for the proposition that an employer cannot set qualification standards that tend to screen out individuals because of a medical condition unless that medical condition is job related and consistent with business necessity. Now, I own a law firm and I like softball. And I don't like the state's attorney's softball team. I cannot set up a job qualification that says we shall not hire any lawyers who are not good at softball because softball is not job related or consistent with business necessity for a lawyer. Medical standards imposed by employers must relate to the essential duties of the job. Now, imposing a vaccine mandate. It sounds like this is going to your argument that the promulgation of the policy in the first place, the employer needed to prove that that was justified. Did you raise that below? I didn't see it. I was not counsel of record below. Sorry. Did someone else raise it below? Did your client raise it below? The question is what, your honor? This argument you're making now about that the promulgation of the policy wasn't justified in the first instance. I believe so, your honor. I believe that below there was sufficiently raised to say, wait a minute, this is not I don't want to get it. I've got immune dysregulation. It's not related to my job. I am a computer employee. I work in front of a computer. That's a different argument, I think, than the one that Judge Rushing is asking you about. You seem to be arguing that as a matter of general policy, the employer could not implement a vaccine mandate for any of its employees because it's not a requirement of the job. So that's, I think, what Judge Rushing is asking you, whether or not you made that or somebody. I'm not making that broad of an argument, but I will say, especially, for example, that might fly in the context of Johns Hopkins Hospital. Okay. But even my brother who works there at Johns Hopkins Hospital got an exemption from the vaccine mandate. The vaccine mandate, you have to look at the individual person and the individual job to see whether or not it is job related and consistent with business necessity. It may vary based on your claims, but it seems like, at least for your failure to accommodate claim and your ADA disability claim, there are elements that have been established for that. Do you have a reasonable proposed accommodation that will allow the job functions to be formed? And was that allowed? And it seems like we're talking generally, and our court and other courts have kind of set forth the elements for this claim. And it seems like we're just talking generally about vaccines and COVID and stuff. And maybe if you could anchor your arguments in the elements, that might help. Well, one of the next things I was going to say is that one thing I'm not here to do is to argue the merits or demerits of the vaccine mandate. I'll let that up to Anthony Fauci and Dr. McCary at Johns Hopkins. They can decide that. That's not the question I agree with you 100 percent about the merits of the vaccine. The question real here is whether or not, given her condition, APL had the right to terminate her employment because she refused the vaccine, given her condition and her condition. Well, that includes both her job duties and her medical condition. Her job duties are to sit in front of a computer. She had been doing that for the first 18 months of the COVID pandemic. So are you suggesting that everybody who sat in front of a computer at that lab should have received an exemption? What I'm suggesting is those that requested it for religious or valid medical reasons, yes, they should have. Okay. So it's a subcategory of those people, but not everybody who sat in front of a computer at the lab should have been exempt. Well, you're really getting into a little bit here my last argument. It's a simple question. Yes or no? The question was what? Would everybody who sat in front of a computer at that lab be entitled to an exemption, nothing more appearing on the face of the record? Just, I'm a computer guy. I shouldn't get the vaccine. You're asking my opinion? I think so. I believe so, yes, Your Honor. Under the ADA and under religious exemption, yes, they would. What's the religious exemption in sitting in front of a computer? Not in this one. Not in this case. What I'm saying is there's those two exemptions. And what I'm arguing, Your Honor, is that an employer under that section of the ADA doesn't have the right to impose a medical qualification unless the medical qualification is job-related and consistent with business necessity. That sounds like this broad policy argument again that we're getting into. You're not responding to the particulars of Judge Quattlebaum's sort of focus. You need to focus on the elements of the ADA claim as it applies to your client. Well, perhaps you're moving into the reasonable accommodation issue. And I think that's really kind of, we certainly did argue the failure to reasonably accommodate here. Before you get to that, you have to show that there was a disability that required an accommodation. I would suggest you look at page 28 of the employer's brief wherein they say we were not contesting that she had this condition. So they weren't contesting that she had this condition. That's right on page 28 of their brief. So the question then is whether or not that condition tends to screen out, or imposing the vaccine mandate, tends to screen out people with immune dysregulation conditions. Why is that the question? Why isn't the next question whether the accommodation she proposes to be tested and work remotely, a reasonable accommodation? Doesn't she have to establish that? And part of whether it's reasonable, isn't it fair to say whether accommodation is reasonable, you know, is affected by whether the job requirement and the accommodation are connected at all? I believe, I believe that you're correct, Your Honor, that if the job requirement doesn't involve any aspect of the essential functions of her duties. I think that argument, I think, and I don't mean to make your arguments for you, but I think that argument keeps going back to did the employer have the right to set this job requirement in place in a broad way. And that could be an argument that you made, you know, I think there's a question about whether you did that below. And I don't know how that would shake out. But here it seems to me that if the requirement's in place, if your client is seeking an accommodation, you know, a relief from that policy, doesn't she have to show that the accommodation she seeks connects in some way to the policy? It's her obligation as the plaintiff who has the burden of proof, not Johns Hopkins. Your Honor, in my view, Johns Hopkins has a duty, before it imposes a medical qualification, a medically based qualification, it has the duty to show that the job is job related and consistent with business necessity. That's under 12112B3 and B6. That is their duty to show that it is job related and consistent with business necessity when we're talking about medical qualifications. And if they don't do that, then, no, I don't think she has to do anything further. It's not her burden to convince Dr. Lamb. Dr. Lamb, she submitted, she submitted a signed certification from an immunologist. At that point, they should have jumped into, all right, you've got a condition. We, by the way, APL cannot in any way claim that it had the ability to say that this was safe for her, that she wasn't going to suffer serious medical consequences as a result of taking this, given her immune dysregulation. It was saying instead, you, we're telling you what to do with your body. We're telling you to take a drug that might have serious deleterious effects on you. And we don't care about the fact that you have immune dysregulation. We're telling you to do it or you're going to lose your job. On the record, just to get back to this case and not kind of vaccine policies in general, it seemed like her employer was saying, the problem isn't that you haven't, that we don't think you have Lyme. They said, you have this condition or you've suggested you have it, but we need your help in establishing a connection between why your condition and why you can't be vaccinated. And so they asked for her to give them medical documentation or records. They asked for her to sign an authorization so they could get medical records or authorization, talk to the doctor. And they said, you know, the one, the sort of partial sentence from one doctor saying she has this condition, please exempt her, is not enough to help us make that connection to see why this condition needs this particular accommodation. So can you speak to that? Sure. One thing I would suggest to your Honor is that there is no double blind medical study to show that immune dysregulated people are going to be safe in taking this drug. The plaintiff has to show that her condition needs a certain accommodation, right? That was a reasonable accommodation. So talk about that. Sure. I'll speak to the reasonable accommodation issue. First off, the lower court held that it was her that broke down the accommodation process. I completely disagree with that position, because what really happened here is APL said vaccinate or take a hike. That's what it said. It was only vaccinate or take a hike. She suggested other possible accommodations such as masking and testing and so forth. Okay? Plus she worked there for 18 months with this condition. There was no question about her abilities. There was no question that this affected her ability to do her job. Now, if they had questions, they had the right to send her for a fitness for duty exam. I have clients that are all the time that are sent for fitness for duty exams. They didn't do that. There is nothing in the ADA that says that an employee must sign a medical release form, especially one of visceral and remember what this form would have done. They're not bound by HIPAA. Once she signs this, they can get every medical record of hers from time immemorial or from her birth and do whatever they want with it. They had no right to that. Is that an argument you made below? Not you, but whoever. Yes. She absolutely was clear. She did not want to sign a broad medical release. That was made to the district court. I believe that was brought up in the district court, Your Honor. Show me where. There were places throughout the record where she was saying, and I'm not going to be able to cite you. I know, because it's not there. Where? She raised it below? It's not there. She made a comment about it in her deposition, but no lawyer ever brought that point to the attention of the district court. Do you agree with that? I don't have an answer for you. I don't know, Your Honor. I apologize. No, you don't need to apologize. You just need to tell me whether or not you preserved it. I mean, you're making all kinds of arguments here today that, unfortunately, don't appear to be preserved in the record. And I want you to get back to Judge Rushing's point. Let's assume that we disagree with you as to whether or not the employer was required, should never have established this vaccine as a policy. So the question is, when she was asked to present information as to the connection between Lyme disease and her ability to take the vaccine, you say that the employer said take a hike. Really? Is that what they said? They gave no other accommodation offer to her whatsoever. But they asked her to provide information as to the connection between Lyme disease and her ability to take the vaccine. And that's where the disconnect is. So speak to that. Sure. They attempted to transfer the burden of proof from themselves to show that this requirement was job-related and consistent with business necessity to her, to prove to them. I mean, here we are in the middle of the pandemic. There's no medical evidence out there that could possibly have satisfied Dr. Lamb's request. She's there with this condition. She knows it affects her immune system. And there aren't enough people in the world to be able to say, oh, okay, people with immune problems can still take the vaccine. Rather, Dr. Lamb was insistent that she do it, regardless of the impact that it might have had on her. So he was transferring the burden of proof to her. There was nothing more that she was able to give them. That medical release would not have done anything for him. Rather, he was just going to look at it. He already had her certification from her treating doctor. The medical records were not going to say anything, because they already knew she had the condition. So what was he looking for? I don't know, other than to say, I want more, I want more. He can always ask for more, but that doesn't and I see my time is up. I've got some time left for rebuttals. Go ahead, finish your thought. The bottom line is, he could keep asking for more, but putting the burden of proof on her, I don't think is appropriate. If they really doubted it, they should do what every other employer does when there's a medical condition and say, we want you to go for a fitness for duty exam. And we all know where that would have led. She would have been fit for duty because she had been doing the job for the last 18 months. Thank you, Mr. Connolly. Mr. Schneider. Good morning, Your Honors. May it please the Court, I'm Jeremy Schneider from Jackson Lewis. I represent the- I think you're going to have to speak up a little bit. Mr. Connolly is a little taller than me, so let me put it down a little bit. I represent the Johns Hopkins University Applied Physics Lab. There's three claims really at issue here, Your Honor. First is the failure to accommodate claim. The second is the disability discrimination claim. The third is the unlawful medical inquiry claim. We spent a lot of time on the interactive process and the failure to accommodate claim. I think that's where I'll start. The ADA requires that employers accommodate the known disabilities of their employees. The ADA does not require that an employer immediately grant the accommodation that's specifically requested by an employee, nor are they immediately required to grant any accommodation to the employee upon receipt of it. What the ADA does require is that the employer and the employee engage in a good-faith interactive process with one another where they openly share information. This Court has held repeatedly- Well, the ADA doesn't say anything about this reasonable interactive process. I think the regs and the cases do. That's correct, Your Honor, yes. The case law from this Court has established that the two, that the employer and the employee both have an obligation to engage in that process. Do you even get to that process if the employee doesn't meet his or her burden to show that the disability, that the requested accommodation is necessary based on the disability that's been proffered? No, you don't, Your Honor, and that's precisely one of the arguments that we make. Well, let me ask you about that because, you know, the record does have this admittedly sparse form indicating that she has Lyme disease, but it's signed by a doctor, a doctor of chiropractic, but nonetheless a doctor, that says essentially she can't, she should be exempt from taking the vaccine. And the narrative, it's not clear who filled in the narrative. There may be some question as to whether or not it was Ms. Tarquinio or the office, but why wasn't that enough by itself to then, you know, require the employer to accommodate that? I mean, it's a medical exemption form, and she filled it out. Well, I would, one thing I just want to clarify on these two forms that she submitted with her accommodation request. The first form is a certification that she filled out and signed herself. That's the form that has a few sentences describing what her condition is. Part of the same form, right? No, two separate forms, JA-99 and JA-100 in the joint appendix. The only thing that she submitted from her doctor that was signed at the time of the request for accommodation was JA-100. JA-100 has a checkbox on it, and it says other, other, for a reason for the accommodation. And it says, please provide information, this information in a separate narrative that describes the reason in detail. And the only thing that the doctor wrote on that form is just the diagnosis, chronic Lyme disease plus Lyme-induced immune dysregulation. There is nothing else on that form from the provider. The case law and the regulations say that the interactive process is not only to get at whether an employee can perform the essential functions of the position or what accommodation will get them there, but also to determine whether or not the requested accommodation is necessary in the first place. And I think that's what you were getting at in the opening argument is that the employee. We were, and I get the argument that you haven't, you know, that there wasn't enough, you know, verification that that was necessary. And so I understand that, you know, a rebuttal or rejoinder to that might be, as your colleague, you know, suggests at least one point, look, this is all coming fast. We don't have, you know, years of research about what connects perfectly with COVID and what doesn't. What if the doctor had said she's got Lyme disease, that has an effect on immunities? We don't know yet, because it's all so quick, what the effect of the vaccine will be on someone with Lyme disease. I can't point you to years of study, because this just happened, but I'm worried about it. Would that be enough? Well, first, that would, that's not on the record here, because she didn't provide that. But what I will tell you is that the record. That's effectively what they said, it seems to me. That's in a summary judgment or a pleading stage. Is that not a fair inference of what they're saying? No, I don't think that's a fair inference, because the undisputed record evidence that we proffered in support of our motion for summary judgment actually says the opposite. Dr. Lamb didn't just say no and didn't just say vaccinate or you're out of here. That is not at all what happened. In fact, the lab granted more than half of the accommodation requests, medically-based accommodation requests that it received. It also temporarily accommodated her for a period of time while it considered the request. Dr. Lamb looked at, and this is in the record as well, looked at the available literature, which is the CDC's recommendation, which was issued with the vaccine. Lyme disease was not listed as one of the contraindicated conditions. So, like any employer would do or should do under the interactive process, in the absence of information, the employer goes back and says, we need something a little bit more specific to you. We need a little something that's more current to you and more current to your condition. And if you look at the communications between Dr. Lamb and the accommodations coordinator and Ms. Tarquinio, that's exactly what they were asking for. So, what if the answer was, I can't give you anything more specific, but I'm worried because my patient has this disease, or the patient says it. Say, look, doctors aren't giving me this link that Johns Hopkins wants, but I'm worried. I've got this disease. It's uncertain. I don't want to take a vaccine that might. I have no idea if it will, but might cause me problems. Sure. I think that might have been a concern for anyone. The issue here is, I think. So, would that be sufficient? Would you have granted it? No, I don't think it would have. And the reason why is that the regs and the case law establish that the employer and the employee have to engage in the back and forth. They have to share information. They also can't withhold information from one another. Another important fact here that I think counsel in the briefing has overlooked is that, in the end, Ms. Tarquinio ultimately did go to her doctor just a week or so before her termination. Her medical provider that she saw there told her, you don't qualify for an exemption unless you test positive for active Lyme. She goes and gets the blood test. She tests negative for active Lyme and does not share that information with the lab. Instead, what she does is she picks out one page of the lab report and discusses her own interpretation of a particular marker on that lab report. But that, again, isn't from the provider, and it's only from her. And, in fact, this court has held repeatedly that it's the court's job, and the district court did this, to look at the interactive process, determine who broke it down, and assign blame. And that is exactly what happened here. She withheld information from the lab toward the end. She also stopped the accommodation, the interactive process sort of in its tracks because they were specifically telling her the type of information that they needed. And Dr. Lam offered to speak with the provider. Also undisputed testimony from Dr. Lam in the record says that in most cases where he spoke with a provider, he ultimately changed his mind and said that the accommodation would be requested. What he was really looking for was something that described her then current condition and connected it with the need for the accommodation. And what she submitted in support of her accommodation request were things like 10-year-old, almost 10-year-old diagnoses or 10-year-old lab reports. And that's just not what is required under the law. Current medical information is what's required, as the court has said that before. I will also add that if you look at the undisputed record evidence here, the types of things that are necessary for an employer to meet their burden are all present. There was two months of back and forth with Ms. Starkenio. They specifically told her the types of information that they needed. They also temporarily accommodated her during that time. Even at the end when they ultimately denied her accommodation, they told her, if you submit more information between now and the time that your termination is set to go forward, we will consider it. And they offered to do that. And unfortunately, what Ms. Starkenio came back with was the selective lab report and not revealing the information that her provider told her, which is that she didn't qualify for the exemption. The other one thing that counsel may bring up with regard to that exemption is that she was seen at her doctor's office by a nurse practitioner who wrote that no. And so during briefing below, it was questioned whether or not that was accurately, like that was really what the doctor said. We deposed the doctor. It's undisputed when asked, do you agree with your nurse practitioner's assessment, he said, quote, I 100% agree. And so her own provider, in the end, didn't agree with the requested accommodation she was looking for. Counsel also argues that there's some burden on the employer to immediately consider whether or not exemption from the policy or work from home or masking or testing is appropriate right off the bat. But the problem is the case law doesn't require that of an employer. Instead, an employer is allowed and required to engage in this interactive process. We think that the record shows that the lab did that. One other thing I'll say is that there are a number of issues here that were not briefed below. One is including the scope of the release. The other is whether or not, well, let me talk about the release. I think it's probably, we believe, I think we agree with your honors, that it wasn't briefed fully below. It wasn't raised in the briefing. It isn't what the district court actually decided. And so for those reasons, we don't think it should be considered. Practically speaking, I would encourage you to look at the release. The release is actually not very broad. It's a fillable form. Ms. Storkinio was permitted to fill the boxes out herself. There's a series of checkboxes on there. One of those checkboxes is marked Other. She could check that box and say, please talk to my doctor about my immunodysregulation diagnosis and herself fully limit the scope of the medical inquiry. There's two other claims here, Your Honor. I think I'd like to move on to those two claims unless you have any more questions on the interactive process or the failure to accommodate. Okay. On the disability claim, that claim, essentially the ADA requires or prohibits employers from taking adverse action against their employees because of their disability. Because of here in this context means in the absence of her disability, it's her burden to prove that she would not have been terminated. And the main thrust of Appellant's argument on the disability discrimination claim is that her disability and her refusal to comply with the policy are so intertwined with one another that to terminate for one really is to terminate for another. I feel like that is their argument. A couple things on that point. First, she unequivocally testified in her deposition that she was terminated for not following the policy and not for her disability. Second, that argument runs counter to established Fourth Circuit precedent. If you look at the Hannah P.V. Coates case, in that case the court here held that the ADA does not require an employer to ignore misconduct by one of its employees, even if the misconduct was caused by the employee's disability. And so essentially what they're arguing here is that her refusal to engage or refusal to comply with the policy is the same as terminating her for her disability, even if those two things are related. If a policy touches on a person's disability, if there's a legitimate nondiscriminatory reason for the termination or the employment decision, that that doesn't mean it's employment discrimination or disability discrimination. There's a recent case from September of last year. It came out right around the time we were briefing. This is the Diamondback case. This court held similarly that even if a policy touches on a disability, noncompliance is still a legitimate reason for the termination. One other thing I'll note with regard to the disability discrimination claim is that this case is very unlike a lot of other vaccine cases where an employer may have, for one reason or another, blankedly decided that they were not going to grant certain accommodation requests for whatever reason. That's not what happened here. The record establishes here that the lab did exactly what the ADA requires, which is that they engaged in an individualized process. They evaluated hundreds of these requests for accommodation. They looked at each of them on their merits. Counsel, can I just interrupt you? I'm just trying to understand structurally, in terms of the elements of a case, how this all fits together. Grant, you've spent a lot of time, and I understand why I'm talking about this interactive process. The regs and the cases certainly talk about it. But I think you did effectively concede that she had a qualifying disability and that your client knew about it. I would say we didn't challenge it, Your Honor. We didn't challenge whether she was a qualified individual. In terms of what we're doing, that seems to shift the focus to elements three and four of an ADA claim. And our law seems to place this interactive process at element four. And Chief Judge Diaz talked about this. What I'm trying to figure out is before you get there, does the accommodation, does the requirement that a plaintiff show that a reasonable accommodation would allow the job to be formed as intended, does that element require the plaintiff to show that that accommodation is reasonable? And does that include a connection between the accommodation and the policy seeking relief from? So a couple points on that. I think it is the employee's obligation or their burden to show that the requested accommodation is reasonable. That is implicit in the fourth element of the prima facie case. So, two, is the need to engage in the interactive process. What I will also note is that the employer, there is no burden on the employer to immediately grant the requested accommodation. Actually, in fact, there are many cases decided out of this court where the accommodation process is described as being fluid. It is described as being there is no one-size-fits-all solution to any accommodation. And that is why the courts don't require an employer to immediately grant the accommodation specifically requested by the employee. The employer's burden to offer an accommodation comes in when they have enough information to even evaluate whether the accommodation requested is appropriate in the first place, whether or not it is necessary. And that is what the regs under the ADA describe. What I will also say is that here the employer did precisely, again, the employer did precisely what it is that they are supposed to do. If we were to take appellant's arguments and credit them, it would mean that at any point that an employee requests a medical accommodation that implicates their medical condition or disability, that an employer wouldn't be able to ask for more information about what their condition is. There are cases that say we are allowed to look at what the duration of the disability is, what the impacts of it are, how it impacts the major life activities, and how it impacts their ability to perform the essential functions of the position. And all of that comes before an employer's obligation to offer a specific accommodation. And that is where this all broke down. It all broke down because Mr. Arquino refused to provide the information asked for from the provider and didn't engage in the accommodation process in good faith. And we think the district court got that right. The last claim is the unlawful medical inquiry claim. Counsel argued about whether it's job related and subject to business necessity. What that really sort of comes from are cases like the coffee case, where this court held that an employer is allowed to ask for medical information if an employee requests an accommodation. Also, those cases stand for the proposition that any medical inquiry having to do with the requested accommodation is job related and subject to business necessity. And again, it's an objective test if you look at the Hanna P case or the coffee case. That's what this court has said. It's an objective determination about whether or not they can ask for information. And the limitation on this and the reason why the regulations or the law was the reason why the law prohibits unlawful medical inquiries is to stop employers from indiscriminately asking for medical information or subjecting employees to fitness for duty exams where none is appropriate. That's not what happened here. All of the medical inquiries were subject to or only came about because she requested an accommodation. They weren't asking her prior to that for anything. She had Lyme's for a very long time, as she testified to herself, and they never asked her any questions about it. Only when the accommodation is requested do they ask for information. Those requests can't be more broad than is necessary. I don't know what the broad medical inquiry is here, Your Honor. They asked her for specific information from her provider about her current condition. It's related to the request for accommodation. They asked her for vaccination status. This is another thing that appellant has argued in the briefing. But the EEOC and other courts have held that asking for a simple up or down on vaccination status isn't a medical inquiry. Can I ask about Mr. Collins' argument that what should have happened here was that the employer should have sought a fitness for duty exam? What's your response to that? Fitness for duty exams usually come up in the context of what the ADA calls a direct threat. When you have a question about whether an employee can perform the essential functions of their job safely, that is typically where the ADA contemplates the use of a fitness for duty exam. The requested accommodation doesn't necessarily have to do with the ability of the employee to safely perform the functions of their job. You were suggesting that she couldn't, right? Well, what we're not suggesting is that the ADA requires that with or without an accommodation, an employee can perform the essential functions of their position. We were in the accommodations process, and so the employee has the burden to show that the requested accommodation is reasonable, will allow them to perform the essential functions. We're not questioning whether or not there was some proposed accommodation that would have worked for her. It's possible. In fact, again, the record shows that the lab granted more requests than it denied, and so there were accommodations available. We just never got to the point where they were required or they were able to offer an accommodation. All right. Thank you, Mr. Fickotter. Thank you very much. Mr. Collins. Thank you. I would point you to page 100 of the joint record, excuse me, of the joint appendix, where it says, this is signed by Dr. Schwartz. It's not just listing a diagnosis. It says, the above-named person should not be immunized for COVID for the following reasons. So it says precisely what you were asking about. Does she have a certification that says she shouldn't be certified? It says it right there. And it says, reason other, chronic Lyme disease and Lyme-induced immune dysregulation. So that's when the Lyme disease causes an immune response that we don't know what it's going to do when you put another antigen in there. And that's what they were requesting that she ignore, just go forward with what they were demanding and take this vaccine. So can I ask you about that? So in response, your colleague on the other side says, well, doctor, their doctor had looked at the relevant literature and analysis to date and saw that Lyme disease was not a contraindication for the vaccine and therefore asked for more information. Why was that unreasonable? Your Honor, there wasn't, as Judge Quattlebaum said, there really wasn't more to do. There aren't any other, there aren't any studies out there for people with immune dysregulation to be able to say, look, COVID-19 vaccines cause problems for immune dysregulated people. Yes, it was, if you want to call it a worry, you can call it a worry. She was worried, her doctor was worried about the response because she had had a long bout of immune dysregulation that was causing all sorts of problems with her body and she had gone through 10 years of treatment for this, got herself healthy, she was able to work full time, full duty, et cetera, because she had taken care of this situation and she was very worried, so to speak, that this was going to throw things off. And that was a very reasonable worry. Let's talk about the reasonable accommodation. I keep saying that the only thing they offered was vaccinate or take a hike, and that is exactly what they did, eventually. I mean, they gave her a little bit of time, sure, okay? But they were not in a, they didn't consider those other possibilities, work at home, masking, social distancing, all of those other reasonable accommodations. They didn't consider that, even though there was nothing particular about her job that would have prevented that. Why didn't they? Well, I'll tell you one thing. If we get into the disability discrimination count, I would refer you to page 171. And in that, it's really kind of amazing when you look at it, and, you know, you try to come up with something a little bit new for oral argument, right, to make something a little bit interesting here, instead of just repeat what I said in my brief. But look at this. It says right here, as a result of this action, for two years from the date of your termination, you are not eligible for subsequent employment by the lab of any kind, contractual, employment, whatever, for two years. Why? They were retaliatory. They said, you can't come back here for two years because, why? Because you didn't accept a vaccine. Now, that's discrimination right there. Now, the — let me go back to the medical authorization form. There is nothing in the record to show that she was permitted to do anything but to sign the medical authorization, which they could then fill out and send to whatever doctor they wanted, and then do whatever they want with those medical records. It didn't say, you can fill this out and limit it to immune dysregulation conditions. It didn't say that. Plus, we all know that medical records have a history in them. They give you — anytime you get a medical record from a new doctor, what do they do? They take a physical and a history, and they write down every medical condition you have. So the employer was demanding that she provide to them an authorization to get her entire medical history. That's what they were demanding, and there is nothing in the ADA that requires that, which goes back to this idea that I have, because I do a lot of disability discrimination cases, and I do a lot of employment representation, and employers have the right to demand a fitness for duty exam. That is the way they should have handled this. If they really doubted that she couldn't do her job, give her a fitness for duty exam. Now, it kind of misses the mark here, doesn't it, because we all know she was fit for duty. She was completely fit for duty, as she had been doing for the prior 18 months. So I see my time is up, or it's going to be up in five seconds. I thank you for your time, and I'm anxious for you to sit. Thank you. Thank you, Mr. Collins. I appreciate your argument. You as well, Mr. Snyder. We'll come down and greet you, and then move on to our second case.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., Allison J. Rushing